SCHOTT, Judge.
In this workers’ compensation case, plaintiff, Victorian Clofer, was awarded benefits for total disability resulting from two accidents he sustained while working for defendant, Pratt-Farnsworth, Inc., in June, 1977. The issue is whether the ultimately disabling condition of avascular necrosis of the left hip joint which was diagnosed in July, 1980, was caused by the accidents.
Plaintiff had been employed as a truck driver by defendant for two years prior to June, 1977. At the time of his first accident on June 7 he was unloading I-beams when he (according to his description) felt a snap in his left hip “like it was hot.” He continued to work that day despite pain and returned to work the next morning. He was unable to finish that day and went to Dr. Axelrod, the company physician, for treatment. His condition was diagnosed as a lumbosacral strain for which home heat treatments and medication were prescribed. He was discharged on June 17 and returned to work on June 20. On June 22 he was loading a heavy table saw onto a truck when it slipped and fell on him. He fell on his back side and was pinned under the saw. He was taken to the East Jefferson Hospital with primary complaints of injury to his right arm and was diagnosed to have abrasions and a compression injury to the right forearm and wrist. On July 1 he was again seen by Dr. Axelrod who diagnosed a contusion abrasion of the right forearm and lum-bosacral strain. He prescribed hot packs, ultra sound and medication and referred plaintiff to Dr. Stokes, an orthopedic surgeon.
Dr. Stokes testified as follows: He first saw plaintiff on July 20, 1977. Plaintiff complained of increased pain in the lower back radiating into the scrotal region. No specific point tenderness or muscle spasm was noted. He reviewed X-rays of the cervical spine taken by Dr. Axelrod on July 11 and interpreted them as negative. He concluded that there was no serious disorder of the lower back, and that he was able to work in an unrestricted manner. However, he made some positive findings associated with the injury to plaintiff’s right arm and for this reason he told plaintiff to return to him in four to six weeks. He again saw plaintiff on August 22 and found the forearm much improved. Plaintiff was complaining of intermittent pain and swelling in his left ankle, but Dr. Stokes made no positive findings and concluded that plaintiff could be working in an unrestricted manner.
Dr. Stokes saw plaintiff again on March 28,1978, at the request of defendants’ claim adjuster and was given reports from Dr. Adatto, an orthopedic surgeon, and Dr. Dy-sart, a physician who had done some elec-tromyograms and nerve conduction studies. According to Dr. Dysart his impression was that plaintiff had radiculopathy at C4, 5, 6, L4, 5, and SI bilaterally, a bilateral carpal tunnel syndrome and a right ulnar nerve neuropathy. Dr. Adatto planned to schedule plaintiff for an in-hospital myelogram.
Dr. Stokes further testified: Plaintiff had multiple complaints of headache, swelling of his right arm, low back pain, bilateral groin pain, pain in his left calf and ankle, swelling of his left leg, and stiffness of both feet. He had been experiencing pain in his groin and occasional low back discomfort with coughing. After an examination Dr. Stokes concluded that there were no clinical findings consistent with nerve root compression or irritation of the cervical or lumbar spines, and he did not believe that mye-lography or surgery was in order. However, because of Dr. Dysart’s positive elec-tromyogram he suggested an opinion from another electromyographer which was obtained in April and confirmed Dr. Stokes’ opinion.
Plaintiff testified as follows: After his first visit to Dr. Stokes he went to Charity Hospital where physical therapy and medication for pain were prescribed. He continued to have pain on his left side and went to Dr. Marrero. He hospitalized plaintiff for fifteen days for tests, treated him for a year, and referred him to Drs. Richardson *1297 and Nadell, neurologists. After being hospitalized by them for tests they prescribed an electric apparatus to relieve pain in his lower back.
In their report, Drs. Richardson and Na-dell stated that they saw plaintiff on May 8, 1979, with the chief complaint of lower back pain. Upon examination they concluded that he had musculoskeletal pain, depression, and hysterical personality traits and arranged for him to be treated in the pain rehabilitation unit at Hotel Dieu Hospital. They saw him on August 6, 1979, for a followup examination after his stay in the hospital and plaintiff stated that his pain was as severe as ever. At that time he was walking with a cane, using a lumbosacral corset, and was on a TENS stimulator. They concluded that plaintiff had minimal findings objectively but marked pain behavior with maximal complaints. They felt that he could return to gainful employment but was “obviously extremely poorly motivated.”
Plaintiff was seen by Dr. John Edmunds on February 14, 1980, who testified as follows: Plaintiff was using a cane, back brace, walked slowly and deliberately with marked limitation of spine motion, and was unable to bend forward to touch his knees. He had muscle spasm in his back with complaints of pain and radiation upon coughing. He thought plaintiff had a ruptured disc in the lower lumbar spine with nerve root compression. He reviewed the previous studies made on plaintiff and admitted him to the Tulane Medical Clinic for further evaluation on July 2,1980. After extensive tests, including X-rays, he found that plaintiff had avascular necrosis of the left hip which is death of the bone in the ball portion of the ball and socket hip joint. He explained that when the possibility of a ruptured disc was ruled out following numerous tests he began to look elsewhere and reexamined plaintiff in detail. He testified:
“. . . When I did it, it then became evident to me that the problems that he was having were arising in the left hip and that his complaints, a lot of his complaints were referred pain, complaints that were arising in the hip...”
Dr. Edmunds further testified that when he realized he had to look elsewhere than the spine for the origin of plaintiff’s problems and further X-ray studies revealed the necrosis in the hip joint he injected an anesthetic agent into the joint and plaintiff had a complete resolution of pain in his back, hip and leg. Dr. Edmunds stated:
“He then was able to get up off of the table, was able to walk without a cane, was able to squat without pain, and was able to run up and down the hall without pain with a smile on his face which was something he was unable to do before. Of course this is with an anesthetic agent in the hip joint.”
Thus, plaintiff’s problem was dramatically demonstrated and Dr. Edmunds scheduled him for hip joint surgery in September which consisted of the removal of the dead bone and the placement of a metallic device to replace the hip joint.-
Dr. Edmunds testified that trauma is one of the precipitating causes of avascular necrosis if a fracture occurs in the hip joint area. He explained that X-ray studies do not necessarily disclose an undisplaced fracture because such “is very subtle and can be missed on initial X-rays.” Asked to explain why plaintiff never complained specifically about hip pain, Dr. Edmunds replied that the general complaints plaintiff had of pain in the groin and low back were the equivalent of hip pain. Dr. Edmunds concluded that while there are various causes for avascular necrosis, considering plaintiff’s history, he suffered an undisplaced fracture in one of the accidents of June, 1977, which produced the condition which was finally diagnosed and treated in September, 1980.
Defendants rely primarily on the testimony of Dr. Stokes and a report from Dr. Brown to refute the opinion of Dr. Ed-munds.
Dr. Stokes testified that a compression injury can bring about avascular necrosis but he explained that this condition “sort of sneaks up on you. You have very minimal symptoms at first becoming progressively *1298 worse” However, he stated that the condition would normally manifest itself in seven or eight months following the trauma, and that plaintiff’s history was not consistent with the condition being caused by the June, 1977, accidents.
Dr. Brown, who examined plaintiff at defendants’ request in August, 1978, and reported no objective evidence of injury to the spine, gave the following report of his X-ray studies of plaintiff’s hip:
“There is irregularity of the left femoral head with two areas of increased density and osteophyte on the femoral head. This joint space is slightly narrowed and there is an osteophyte projecting from the superior margin of the acetablum. These changes are consistent with osteoarthritis of the hip.”
Defendants argue that this evidence supports the conclusions that 1) plaintiff’s avascular necrosis could not have developed from a fracture which occurred over three years previously, and 2) his condition was caused by degenerative arthritis.
In Adams v. New Orleans Public Service, Inc. (La.1981) (No. 81-C-0784 Sup. Ct. September 28, 1981), the court restated the rule that where there is proof of an accident and the following disability without any intervening cause, it is presumed that the accident caused the disability. Applying this rule to the instant case, the burden shifted to defendants to prove that plaintiff’s disability was caused by something other than the accident. From the detailed review of the testimony provided in this opinion it should be clear that .the defendants did not carry their burden of proof.
The evidence is clear that plaintiff continued to suffer with some serious difficulty for several years following the accidents. All the doctors who examined him until he was finally seen by Dr. Edmunds were preoccupied with the notion that his problem was in the low back but none found out what was wrong because they were all looking at his spine. The closest anyone came was Dr. Brown, but his report, standing alone, does not rule out the possibility that plaintiff had sustained an undisplaced fracture at the time of the injury. While the testimony of Dr. Edmunds was qualified to some extent he clearly attributed plaintiff’s problem to the accidents, and while Dr. Stokes did not share their opinion a close reading of his testimony does not provide a clear refutation of Dr. Edmunds’ opinion.
Like the trial judge, we conclude that defendants did not rebut the presumption that plaintiff’s disability was caused by the accident and the judgment is affirmed.
AFFIRMED.